**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

SHAWNA RODARTE                    )
                                  )
               Plaintiff,         )
     v.                           )
                                  )      Case No. 1:20-cv-02401-RBJ
JOHNSON & JOHNSON and             )
ETHICON INC.,                     )
                                  )
               Defendants.        )

**FIRST AMENDED COMPLAINT AND JURY DEMAND**

COMES NOW Plaintiff, SHAWNA RODARTE ("Plaintiff"), by and through her attorneys, and files this First Amended Complaint with leave of Court against Defendants, JOHNSON & JOHNSON and ETHICON INC., as follows:

**PARTIES**

1.     This action seeks to recover damages for the injuries sustained by SHAWNA RODARTE ("Plaintiff") as the direct and proximate result of the wrongful conduct and negligence of the Defendants in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distributing, labeling, and selling of the Ethicon TVT Exact Continence System mesh product implanted in Plaintiff.

2.     Defendant, JOHNSON & JOHNSON ("J&J") is a corporation, and according to its website, the world's largest and most diverse medical device and diagnostics company, with its worldwide headquarters and principle place of business located at One Johnson & Johnson Plaza, New Brunswick, New Jersey. Johnson & Johnson is incorporated in New Jersey and is therefore a citizen of the state of New Jersey. Johnson & Johnson organizes its subsidiary businesses into individual Business Units to coordinate the development, manufacture, testing, marketing promotion, training, distribution and sale of its' pelvic floor repair products. Within

J&J there are three sectors, medical devices and diagnostics, pharmaceutical, and consumer. Within the medical devices and diagnostic sector are "Business Units" including the "Ethicon Franchise." The Ethicon Franchise was charged by J&J with the design, development, promotion, marketing, testing, training, distribution and sale of the pelvic floor repair products at issue in this case. The Company Group Chairman and Worldwide Franchise Chairman for the Ethicon Franchise, Gary Pruden, is employed by J&J. The companies which comprise the Ethicon Franchise are thus controlled by J&J and include, but are not limited to, Ethicon Inc., Ethicon LLC, Ethicon LTD.

3.      Defendant, ETHICON, INC. is a wholly owned subsidiary of Defendant J&J located in Somerville, New Jersey. ETHICON INC. is incorporated in New Jersey, its principle place of business is in New Jersey, and therefore is a citizen of the state of New Jersey.

4.      At all times relevant herein, J&J and Ethicon Inc., were engaged in the business of placing medical devices into the stream of commerce by designing, manufacturing, testing, training, marketing, promoting, packaging, labeling, and/or selling such devices, including the TVT Exact Continence System implanted in Plaintiff. At all times relevant hereto, and, upon information and belief, J&J, Ethicon, Inc., and Ethicon, LLC manufactured, marketed, advertised, promoted and sold the TVT Exact Continence System worldwide.

5.      Defendants J&J and Ethicon, Inc, (hereinafter referred to collectively as "Defendants") had a legal duty to ensure the safety and effectiveness of their pelvic mesh products by conducting adequate and well-controlled studies on their products prior to marketing. Defendants deliberately chose to manipulate the only studies that were conducted on their products and by so doing provided doctors and patients with false and misleading information about the safety and effectiveness of their pelvic mesh products. Furthermore,

Defendants made a conscious decision to forego performing studies and creating registries that would have provided doctors, including Plaintiff's implanting physician, and patients in the United States with accurate information regarding the lack of proof of the safety and effectiveness of their pelvic mesh products.

## JURISDICTION AND VENUE

6. Plaintiff is a citizen and resident of the state of Colorado.

7. Defendants have significant contacts with the United States District Court of the District of Colorado such that they are subject to the personal jurisdiction of the court in said district.

8. A substantial part of the events and omissions giving rise to Plaintiff's causes of action occurred in the United States District Court of the District of Colorado. Pursuant to 28 U.S.C. § 1391(a), venue is proper in said district.

9. Federal subject matter jurisdiction in the constituent actions is based upon 28 U.S.C. § 1332(a), in that there is complete diversity among Plaintiff and Defendants and the amount in controversy exceeds $75,000.

## FACTUAL BACKGROUND

10. Surgical mesh products have been used to repair abdominal hernias since the 1950s. In the 1970s, gynecologists began using surgical mesh products designed for hernia repair for abdominal repair to surgically repair prolapsed organs. In the 1990s, gynecologists began using this surgical mesh for the surgical treatment of pelvic organ prolapse ("POP") and stress urinary incontinence ("SUI"). Manufacturers, including Defendants, began to modify the mesh used in hernia repair to be used as products specifically intended to correct POP a SUI. Today, defendants sell pelvic mesh "kits" which can include not only the surgical mesh, but also tissue

fixation anchors and insertion tools. The TVT Exact Continence System manufactured by Defendants (hereinafter referred to as the "Mesh Product") are considered Class II medical devices.

11.     The Mesh Product implanted in Plaintiff is targeted for women who suffer from stress urinary incontinence as a result of the weakening or damage caused to the walls of the vagina. It is specifically promoted to physicians and patients as an innovative, minimally invasive procedure with minimal local tissue reactions, minimal tissue trauma and minimal pain while correcting stress urinary incontinence.

12.     Moreover, the Mesh Product implanted in Plaintiff contains polypropylene mesh. Despite claims that this material is inert, the scientific evidence shows that this mesh material is biologically incompatible with human tissue and promotes an immune response in a large subset of the population receiving the Mesh Product. This immune response promotes degradation of the polypropylene mesh, as well as the pelvic tissue, and can contribute to the formation of severe adverse reactions to the mesh.

13.     At various times, Defendants sought and obtained Food and Drug Administration ("FDA") clearance to market their mesh products, including the Mesh Product implanted in Plaintiff, under Section 510(k) of the Medical Device Amendment. Section 510(k) allows marketing of medical devices if the device is deemed substantially equivalent to other legally marketed predicate devices marketed prior to May 28, 1976. This clearance process did not require Defendants to prove the safety or efficacy of their mesh products and, thus, a formal review of the safety and efficacy of the Mesh Product was never conducted with regard to the Mesh Product.

14. At all times relevant hereto, the mesh products, including the Mesh Product implanted in Plaintiff, were marketed to the medical community, including Plaintiff's implanting physician, and directly to patients as safe, effective, reliable, medical devices; implanted by safe and effective, minimally invasive surgical techniques for the treatment of medical conditions, primarily vaginal vault prolapse, stress urinary incontinence, pelvic organ prolapse and/or rectocele, and as safer and more effective as compared to the traditional products and procedures for treatment.

15. Upon information and belief, the Defendants have consistently underreported and withheld information about the propensity of their mesh products, including the Mesh Product implanted in Plaintiff, to fail and cause injury and complications, and have misrepresented the efficacy and safety of the Mesh Product, through various means and media, actively and intentionally misleading the FDA, the medical community, patients, and the public at large.

16. Despite the chronic underreporting of adverse events associated with their mesh products, including the Mesh Product implanted in Plaintiff, eventually enough complaints were recorded for the FDA to issue a public health notification regarding the dangers of these devices.

17. On July 13, 2011, the FDA issued a Safety Communication wherein the FDA stated that "serious complications associated with surgical mesh for transvaginal repair of POP are **not rare**" (emphasis in the original).

18. The FDA Safety Communication also stated, "*Mesh contraction* (shrinkage) is a previously unidentified risk of transvaginal POP repair with mesh that has been reported in the published scientific literature and in adverse event reports to the FDA . . . Reports in the literature associate mesh contraction with vaginal shortening, vaginal tightening and vaginal pain." (emphasis in original).

19.     In a December 2011 Joint Committee Opinion, the American College of Obstetricians and Gynecologists ("ACOG") and the American Urogynecologic Society ("AUGS") also identified physical and mechanical changes to the mesh inside the body as a serious complication associated with vaginal mesh, stating:

> "There are increasing reports of vaginal pain associated with changes that can occur with mesh (contraction, retraction, or shrinkage) that result in taut sections of mesh . . . Some of these women will require surgical intervention to correct the condition, and some of the pain appears to be intractable."

20.     Plaintiff's injuries were reported in the FDA Safety Communication and in the ACOG/AUGS Joint Committee Opinion.

21.     The FDA Safety Communication further indicated that the benefits of using transvaginal mesh products instead of other feasible alternatives did not outweigh the associated risks.

22.     The FDA summarized its findings from its review of the adverse event reports and applicable literature stating that it "has NOT seen conclusive evidence that using transvaginally placed mesh in POP repair improves clinical outcomes any more than traditional POP repair that does not use mesh, and it may expose patients to greater risk." (Emphasis in original).

23.     The FDA White Paper further stated that "these products are associated with serious adverse events . . . Compounding the concerns regarding adverse events are performance data that fail to demonstrate improved clinical benefit over traditional non-mesh repair."

24.     Defendants knew or should have known about the Mesh Product's risks and complications identified in the FDA Safety Communication and the ACOG/AUGS Joint Committee Opinion.

25.     Defendants knew or should have known that the Mesh Product implanted in Plaintiff unreasonably exposed Plaintiff to the risk of serious harm while conferring no benefit over available feasible alternatives that do not involve the same risks.

26.     Defendants had sole access to material facts concerning the defective nature of the Mesh Product, and its propensity to cause serious and dangerous side effects and hence, cause dangerous injuries and damage to persons who used the Mesh Product.

27.     The scientific evidence shows that the material from which the Mesh Product is made is biologically incompatible with human tissue and promotes a negative immune response in a large subset of the population, including Plaintiff.

28.     This negative response promotes inflammation of the pelvic tissue and contributes to the formation of severe adverse reactions to the mesh, such as those experienced by Plaintiff.

29.     The FDA defines both "degradation" and "fragmentation" as "device problems" to which the FDA assigns a specific "device problem code." "Material Fragmentation" is defined as an "[i]ssue associated with small pieces of the device breaking off unexpectedly" and "degraded" as an "[i]ssue associated with a deleterious change in the chemical structure, physical properties, or appearance in the materials that are used in device construction." The Mesh Product was unreasonably susceptible to degradation and fragmentation inside the body.

30.     The Mesh Product was unreasonably susceptible to shrinkage and contraction inside the body.

31.     The Mesh Product was unreasonably susceptible to "creep" or the gradual elongation and deformation when subject to prolonged tension inside the body.

32.     At all times relevant hereto, the Mesh Product was marketed to the medical community, including Plaintiff's implanting physician, and to patients as safe, effective, reliable,

medical devices, implanted by safe and effective, minimally invasive surgical techniques, and as safer and more effective as compared to available feasible alternative treatments for stress urinary incontinence, and other competing products.

33.    Defendants omitted the risks, dangers, defects, and disadvantages of the Mesh Product, and advertised, promoted, marketed, sold and distributed the Mesh Product as a safe medical device when Defendants knew or should have known that the Mesh Products were not safe for their intended purposes, and that the Mesh Product would cause, and did cause, serious medical problems, and in some patients, including Plaintiff, catastrophic injuries.

34.    Contrary to Defendants' representations and marketing to the medical community, Plaintiff's physician, and to the patients themselves, their mesh products, including the Mesh Product implanted in Plaintiff, have high rates of failure, injury, and complications, fail to perform as intended, require frequent and often debilitating re-operations, and have caused severe and irreversible injuries, conditions, and damage to a significant number of women, including Plaintiff, making these products defective under the law.

35.    Defendants have underreported information about the propensity of their mesh products, including the Mesh Product implanted in Plaintiff, to fail and cause injury and complications and have made unfounded representations regarding the efficacy and safety of the mesh products through various means and media.

36.    Defendants failed to perform proper and adequate testing and research in order to determine and evaluate the risks and benefits of their mesh products, including the Mesh Product implanted in Plaintiff.

37.     Defendants failed to design and establish a safe, effective procedure for removal of the Mesh Product, or to determine if a safe, effective procedure for removal of the Mesh Product exists.

38.     The Mesh Product was at all times utilized and implanted in a manner foreseeable to Defendants, as Defendants generated the instructions for use, created the procedures for implanting the devices, and trained the implanting physician.

39.     Defendants provided incomplete and insufficient training and information to physicians, including Plaintiff's physician, regarding the use of the Mesh Product, and the aftercare of patients implanted with the Mesh Product.

40.     The Mesh Product implanted in Plaintiff was in the same or substantially similar condition as they were when they left Defendants' possession, was defective at the time of manufacture, and in the condition directed by and expected by Defendants.

41.     The injuries, conditions, and complications suffered by numerous women around the world who have been implanted with mesh products, including the Mesh Product implanted in Plaintiff, include, but are not limited to, erosion, mesh contraction, infection, fistula, inflammation, scar tissue, organ perforation, dyspareunia (pain during sexual intercourse), blood loss, neuropathic and other acute and chronic nerve damage and pain, pudendal nerve damage, pelvic floor damage, and chronic pelvic pain

42.     In many cases, including Plaintiff's, the women have been forced to undergo extensive medical treatment, including, but not limited to, operations to locate and remove mesh, operations to attempt to repair pelvic organs, tissue, and nerve damage, the use of pain control and other medications, injections into various areas of the pelvis, spine, and the vagina, and operations to remove portions of the female genitalia.

43.	The medical and scientific literature studying the effects of Defendants' mesh products, like that of the Mesh Products implanted in Plaintiff, has examined each of these injuries, conditions, and complications, and has reported that they are causally related to the Mesh Products.

44.	Removal of contracted, eroded and/or infected mesh can require multiple surgical interventions for removal of mesh and results in scarring on fragile compromised pelvic tissue and muscles.

45.	At all relevant times herein, Defendants continued to promote their mesh products, including the Mesh Product implanted in Plaintiff, as safe and effective even when no clinical trials had been done supporting long- or short-term efficacy.

46.	In doing so, Defendants failed to disclose to Plaintiff's implanting physician, the known risks and failed to warn of known or scientifically knowable dangers and risks associated with the Mesh Product.

47.	The Mesh Product implanted in Plaintiff, as designed, manufactured, distributed, sold and/or supplied by Defendants was defective as marketed due to inadequate warnings, instructions, labeling and/or inadequate testing in the presence of Defendants' knowledge of lack of safety.

48.	Defendants knew that the Mesh Product implanted in Plaintiff, as designed, manufactured, distributed, sold and/or supplied by Defendants, was defective as marketed due to inadequate warnings, instructions, labeling and/or inadequate testing at the time it left Defendants' control.

49.     On or about September 21, 2017, Plaintiff had the Mesh Product implanted at SCL Denver Urogynecology in Denver, Colorado, by her implanting physician to treat her urinary incontinence.

50.     Thereafter, Plaintiff began experiencing painful and serious complications, including but not limited to, urinary incontinence; urinary frequency; dyspareunia; cramping; abnormal bleeding; constant, excruciating pain; and mesh exposure.

51.     On or about July 13, 2020, Plaintiff underwent an operation at Kaiser Permanente in Denver, Colorado, for revision of exposed mesh.

## CAUSES OF ACTION

## COUNT I: NEGLIGENCE

52.     Plaintiff hereby incorporates Paragraphs 1-51 and further states as follows:

53.     Defendants had a duty to Plaintiff, to use reasonable care in designing, manufacturing, marketing, labeling, packaging and selling the Mesh Product, including a duty to ensure that the Mesh Product did not pose a significantly increased risk of bodily injury to its users.

54.     Defendants had a duty to sufficiently and adequately warn Plaintiff's implanting physician of the aforementioned risks, dangers and complications of the Mesh Product, and the severity and frequency of the aforementioned risks, dangers and complications of the Mesh Product.

55.     Defendants had a duty to exercise reasonable care in the advertising and sale of the Mesh Product, including a duty to warn and instruct Plaintiff's implanting physician, of the dangers associated with the use of the Mesh Product that were known or should have been known to Defendants at the time of the sale of the Mesh Product to the Plaintiff.

56.     Defendants had a duty to exercise reasonable and ordinary care in the recruitment and training of physicians to implant the Mesh Product.

57.     Defendants knew or should have known Plaintiff could foreseeably suffer injury as a result of Defendants' failure to exercise ordinary care in providing adequate warnings as described herein.

58.     Defendants knew or should have known Plaintiff could foreseeably suffer injury as a result of the defective design of the Mesh Product.

59.     Defendants breached their duty to Plaintiff by failing to exercise due care under the circumstances.

60.     Defendants were negligent in failing to use reasonable care as described herein in designing, manufacturing, marketing, labeling, packaging and selling the Mesh Product implanted in Plaintiff. Defendants breached their aforementioned duty by:

a.      Failing to design the Mesh Product so as to avoid an unreasonable risk of harm to women in whom the Mesh Product were implanted, including Plaintiff;

b.      Failing to manufacture the Mesh Product so as to avoid an unreasonable risk of harm to women in whom the Mesh Products were implanted, including Plaintiff;

c.      Failing to use reasonable care in the testing of the Mesh Product so as to avoid an unreasonable risk of harm to women in whom the Mesh Product was implanted, including Plaintiff;

d.      Failing to use reasonable care in inspecting the Mesh Product so as to avoid an unreasonable risk of harm to women in whom the Mesh Product were implanted, including Plaintiff;

e.   Otherwise negligently or carelessly designing, manufacturing, marketing, labeling, packaging and/or selling the Mesh Product.

61.   The reasons that Defendants' negligence caused the Mesh Product implanted in Plaintiff to be unreasonably dangerous and defective include, but are not limited to:

a.   the use of polypropylene material in the Mesh Product and the immune reaction that results from such material, causing adverse reactions and injuries;

b.   the design of the Mesh Products to be inserted into and through an area of the body with high levels of bacteria that adhere to the mesh causing immune reactions and subsequent tissue breakdown and adverse reactions and injuries;

c.   biomechanical issues with the design of the Mesh Product, including, but not limited to, the propensity of the Mesh Product to contract or shrink inside the body, that in turn cause surrounding tissue to be inflamed, become fibrotic, and contract, resulting in injury;

d.   the use and design of arms and anchors in the Mesh Product, which, when placed in the women, are likely to pass through contaminated spaces and injure major nerve routes in the pelvic region;

e.   the propensity of the Mesh Product for "creep," or to gradually elongate and deform when subject to prolonged tension inside the body;

f.   the inelasticity of the Mesh Product, causing it to be improperly mated to the delicate and sensitive areas of the pelvis where it is implanted, and causing pain upon normal daily activities that involve movement in the pelvis (e.g., intercourse, defecation); and

g. the propensity of the Mesh Product for degradation or fragmentation over time, which causes a chronic inflammatory and fibrotic reaction, and results in continuing injury over time;

h. the hyper-inflammatory responses to polypropylene leading to problems including chronic pain and fibrotic reaction;

i. the propensity of the polypropylene products to degrade after implantation in the female pelvis, causing pain and other adverse reactions;

j. the adverse tissue reactions caused by the polypropylene products, which are causally related to infection, as the polypropylene is a foreign material to the human body;

k. the harshness of cross-linked polypropylene upon the female pelvic tissue, and the hardening of the product in the body;

l. the creation of a non-anatomic condition in the pelvis leading to chronic pain and functional disabilities when the mesh is implanting according to the manufacturers' instructions.

62. Defendants also breached their duty by negligently failing to warn or instruct Plaintiff's implanting physician of subjects including, but not limited to, the following:

a. the Mesh Product's propensities to contract, retract, and/or shrink inside the body;

b. the Mesh Product's propensities for degradation, fragmentation and/or creep;

c. the Mesh Product's inelasticity preventing proper mating with the pelvic floor and vaginal region;

d. the rate and manner of mesh erosion or extrusion;

e. The risk of chronic inflammation resulting from the Mesh Product;

f.    the risk of chronic infections resulting from the Mesh Product;

g.    the risk of permanent vaginal or pelvic scarring as a result of the Mesh Product;

h.    the risk of recurrent, intractable pelvic pain and other pain resulting from the Mesh Product;

i.    the need for corrective or revision surgery to adjust or remove the Mesh Product;

j.    the severity of complications that could arise as a result of implantation of the Mesh Product;

k.    the hazards associated with the Mesh Product;

l.    the Mesh Product's defects described herein;

m.    treatment of stress urinary incontinence with the Mesh Product is no more effective than safer and feasible available alternatives;

n.    treatment of stress urinary incontinence with the Mesh Product exposes patients to greater risk than safer and feasible available alternatives;

o.    treatment of stress urinary incontinence with the Mesh Product makes future surgical repair more difficult than safer and feasible available alternatives;

p.    use of the Mesh Product puts the patient at greater risk of requiring additional surgery than safer and feasible available alternatives;

q.    removal of the Mesh Product due to complications may involve multiple surgeries and may significantly impair the patient's quality of life; and

r.    complete removal of the Mesh Product may not be possible and may not result in complete resolution of the complications, including pain.

63.    The Mesh Product was defective by reason of failure of Defendants to provide adequate warnings and instructions.

64.     At the time of manufacture and conveyance, Defendant, by exercising reasonable diligence, could have made the aforementioned warnings regarding the Mesh Product available to Plaintiff, Plaintiff's implanting physician, and the medical community.

65.     At the time of manufacture and conveyance, Defendants did not adequately provide Plaintiff's implanting physician with the information concerning the likelihood and severity of injury resulting from the aforementioned design defects of the Mesh Product implanted in Plaintiff.

66.     Defendants intentionally, recklessly and maliciously misrepresented the safety, risks and benefits of the Mesh Product, understating the risks and exaggerating the benefits in order to advance their own financial interests, with wanton and willful disregard for the rights and health of the Plaintiff.

67.     As a direct and proximate result of having the Mesh Product implanted in her with the aforementioned defects, Plaintiff experienced the aforementioned painful and serious complications, including but not limited to urinary incontinence; urinary frequency; dyspareunia; cramping; abnormal bleeding; constant, excruciating pain; and mesh exposure..

68.     As a direct and proximate result of Defendants' negligent failure to provide Plaintiff and Plaintiff's implanting physician with sufficient or adequate warnings, Plaintiff experienced the aforementioned painful and serious complications, including but not limited to urinary incontinence; urinary frequency; dyspareunia; cramping; abnormal bleeding; constant, excruciating pain; and mesh exposure..

69.     As a direct and proximate result of Defendants' negligence, Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment, including multiple procedures to correct her injuries, and will

likely undergo further medical treatment and procedures, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, and/or lost income, and other damages.

## COUNT II: STRICT LIABILITY – DESIGN DEFECT

70.     Plaintiff hereby incorporates by reference Paragraphs 1-51 and further states as follows:

71.     Plaintiff is an expected user or consumer of the Mesh Product.

72.     Safer, feasible and suitable alternatives to the Mesh Product that were available to the Defendants have existed at the time of manufacture and conveyance that do not present the same frequency or severity of risks as does the Mesh Product. Safer and feasible alternatives include but are not limited to, human tissue slings, biological implants, native tissue repair, sutures, slings with less polypropylene, corrective surgery without implanted mesh, and pelvic floor therapy.

73.     The burden of implementing safer, feasible, and alternative designs would not have outweighed the reduction of injury caused to consumers, including Plaintiff.

74.     The Mesh Product implanted in Plaintiff was conveyed in a condition not contemplated by reasonable persons among those considered expected users of consumers of the Mesh Product.

75.     At the tine of manufacture and conveyance, the Mesh Product failed to meet the minimum safety expectations of the ordinary user and consumer: Plaintiff expected that the Mesh Product would treat and/or remedy her urinary incontinence without causing the aforementioned serious and painful complications.

76. The ordinary user and consumer would not consider the Mesh Product sufficiently safe given the aforementioned risks, dangers, and complications associated with the Mesh Product.

77. The Mesh Product implanted in Plaintiff was, at the time of manufacture and conveyance, not in conformity with the generally recognized state of the art applicable to the safety of the Mesh Product at the time they were designed, manufactured, packaged, labeled, and/or sold.

78. The Mesh Product implanted in Plaintiff was unreasonably dangerous and not reasonably safe for its intended uses and was defective as described herein with respect to its design. The Mesh Product's design defects include, but are not limited to:

a.  the use of polypropylene material in the Mesh Product and the immune reaction that results from such material, causing adverse reactions and injuries;

b.  the design of the Mesh Product to be inserted into and through an area of the body with high levels of bacteria that adhere to the mesh causing immune reactions and subsequent tissue breakdown and adverse reactions and injuries;

c.  biomechanical issues with the design of the Mesh Product, including, but not limited to, the propensity of the Mesh Product to contract or shrink inside the body, that in turn causes surrounding tissue to be inflamed, become fibrotic, and contract, resulting in injury;

d.  the use and design of arms and anchors in the Mesh Product, which, when placed in the women, are likely to pass through contaminated spaces and injure major nerve routes in the pelvic region;

e.  the propensity of the Mesh Product to "creep," or to gradually elongate and deform when subject to prolonged tension inside the body;

f.  the inelasticity of the Mesh Product, causing them to be improperly mated to the delicate and sensitive areas of the pelvis where they are implanted, and causing pain upon normal daily activities that involve movement in the pelvis (e.g., intercourse, defecation); and

g.  the propensity of the Mesh Product for degradation or fragmentation over time, which causes a chronic inflammatory and fibrotic reaction, and results in continuing injury over time

h.  the hyper-inflammatory responses to polypropylene leading to problems including chronic pain and fibrotic reaction;

j.  the adverse tissue reactions caused by polypropylene products, which are causally related to infection, as it is a foreign material to the human body;

k.  the harshness of cross-linked polypropylene upon the female pelvic tissue, and the hardening of the product in the body;

l.  the creation of a non-anatomic condition in the pelvis leading to chronic pain and functional disabilities when the mesh is implanting according to the manufacturers' instructions.

79.  The aforementioned and foreseeable risks exceed and outweigh the benefit the Defendants purport the Mesh Product provides, that benefit being the treatment of stress urinary incontinence.

80.  As a direct and proximate result of the Mesh Product's aforementioned design defects, Plaintiff experienced urinary incontinence; urinary frequency; dyspareunia; cramping;

abnormal bleeding; constant, excruciating pain; and mesh exposure as a result of the Mesh Product being implanted in her.

81.     As a direct and proximate result of the Mesh Product's aforementioned defects, as described herein, Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment, including multiple procedures to correct her injuries, and will likely undergo further medical treatment and procedures, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, and/or lost income, and other damages.

82.     Defendants are strictly liable to Plaintiff for designing, manufacturing, marketing, labeling, packaging and selling a defective product.

### COUNT III: STRICT LIABILITY – FAILURE TO WARN

83.     Plaintiff hereby incorporates by reference Paragraphs 1-51 and further states as follows:

84.     The Mesh Product implanted in Plaintiff was not reasonably safe and unreasonably dangerous for its intended uses and was defective as described herein as a matter of law due to its lack of appropriate and necessary warnings. Specifically, Defendants did not provide Plaintiff's implanting physician with sufficient or adequate warnings in the Mesh Product's instructions for use, packaging, promoting, marketing, advertising, distributing, and labeling, regarding, among other subjects:

a.     the Mesh Product's propensities to contract, retract, and/or shrink inside the body;

b.     the Mesh Product's propensities for degradation, fragmentation, disintegration and/or creep;

c.      the Mesh Product's inelasticity preventing proper mating with the pelvic floor and vaginal region;

d.      the rate and manner of mesh erosion or extrusion;

e.      the risk of chronic inflammation resulting from the Mesh Product;

f.      the risk of chronic infections resulting from the Mesh Product;

g.      the risk of permanent vaginal or pelvic scarring as a result of the Mesh Product;

h.      the risk of recurrent, intractable pelvic pain and other pain resulting from the Mesh Product;

i.      the need for corrective or revision surgery to adjust or remove the Mesh Product;

j.      the severity of complications that could arise as a result of implantation of the Mesh Product;

k.      the hazards associated with the Mesh Product;

l.      the Mesh Product's defects described herein;

m.      treatment of stress urinary incontinence with the Mesh Product is no more effective than safer and feasible available alternatives;

n.      treatment of stress urinary incontinence with the Mesh Product exposes patients to greater risk than safer and feasible available alternatives;

o.      treatment of stress urinary incontinence with the Mesh Product makes future surgical repair more difficult than feasible available alternatives;

p.      use of the Mesh Product puts the patient at greater risk of requiring additional surgery than safer and feasible available alternatives;

q.      removal of the Mesh Product due to complications may involve multiple surgeries and may significantly impair the patient's quality of life; and

r.　complete removal of the Mesh Product may not be possible and may not result in complete resolution of the complications, including pain.

85.　Defendants had a duty to exercise reasonable care in the advertising and sale of the Mesh Product, including a duty to warn and instruct Plaintiff's implanting physician, of the dangers associated with the use of the Mesh Product that were known or should have been known to Defendants at the time of the sale of the Mesh Product to the Plaintiff.

86.　Defendants, by exercising reasonable diligence, could have made such warnings available to Plaintiff's implanting physician.

87.　Defendants breached their duty by failing to sufficiently and adequately warn Plaintiff's implanting physician of the aforementioned risks, dangers and complications of the Mesh Product, and the severity and frequency of the aforementioned risks, dangers and complications of the Mesh Product.

88.　At the time of manufacture and conveyance, Defendants did not adequately provide Plaintiff's implanting physician with information regarding the aforementioned risks, complications and dangers of the Mesh Product, or the severity and frequency of the aforementioned risks, complications and dangers of the Mesh Product.

89.　At all relevant times herein, Defendants failed to provide sufficient warnings and instructions that would have put Plaintiff, Plaintiff's implanting physician, and the medical community, on notice of the dangers and adverse effects caused by implantation of the Mesh Product.

90.　Had Defendants adequately warned Plaintiff's implanting physician of the aforementioned risks, complications and dangers of the Mesh Product, and the severity and likelihood of the aforementioned risks, complications and dangers, Plaintiff's implanting

physician would have recommended more safer, feasible and suitable alternatives to Plaintiff, and Plaintiff's injuries could have been avoided.

91.     Had Defendants adequately warned Plaintiff's implanting physician of the aforementioned risks, complications and dangers of the Mesh Product, and the severity and likelihood of these risks, complications and dangers, of the Mesh Product, Plaintiff's implanting physician would have made Plaintiff aware of this information, and Plaintiff would not have consented to have the Mesh Product implanted inside her body; and her injuries would have been avoided.

92.     As a direct and proximate result of Defendants' failure to provide Plaintiff's implanting physician with sufficient or adequate warnings regarding the Mesh Product implanted in Plaintiff, Plaintiff and her implanting physician were not adequately informed of the potential dangers and/or defects of the Mesh Product.

93.     As a direct and proximate result of Defendants' failure to adequately warn Plaintiff's implanting physician of the Mesh Product's aforementioned risks, complications, and dangers of the Mesh Product described herein, Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment, including multiple procedures to correct her injuries, and will likely undergo further medical treatment and procedures, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, and/or lost income, and other damages.

WHEREFORE, Plaintiff demands a trial by jury, judgment against Defendants for compensatory and exemplary damages in an amount exceeding $75,000, as well as costs, attorney fees, interest, or any other relief, monetary or equitable, to which they are entitled.

PLAINTIFF DEMANDS A TRIAL BY JURY.

Dated: October 29, 2020

Respectfully submitted,

By: /s/*Rebecca Fredona*
Rebecca Fredona
Pro hac vice Attorney
MOLL LAW GROUP
22 W Washington Street, 15th Floor
Chicago, IL 60602
T: (312) 462-1700
F: (312) 756-0045
rfredona@molllawgroup.com

Keith Fuicelli
FUICELLI & LEE, P.C.
1731 Gilpin Street
Denver, CO 80218
T: (303) 355-7202
keith@coloradoinjurylaw.com

**COUNSEL FOR PLAINTIFF**

**CERTIFICATE OF SERVICE**

I hereby certify that on October 29, 2020, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the CM/ECF participants registered to receive service in this cause of action.

*/s/ Rebecca Fredona*